# NO. 12-18-00035-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *TASHA ERNEST DOUGLAS, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF FRANCISCO DOUGLAS, DECEASED, AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES, SOPHIA KATHERINE ABED AS NEXT FRIEND OF S.K.J.D., A MINOR, JAIME DOUGLAS, FRANCISCO DOUGLAS, JR., AND FRANCISCA PEREZ DELGADO, APPELLANTS* | § § § | *APPEAL FROM THE 7TH* <br><br> *JUDICIAL DISTRICT COURT* |
| *V.* | | |
| *WILLIE J. HARDY, APPELLEE* | § | *SMITH COUNTY, TEXAS* |

### *OPINION*

Tasha Ernest Douglas, individually, as personal representative of the Estate of Francisco Douglas, deceased, and on behalf of all wrongful death beneficiaries, Sophia Katherine Abed as next friend of S.K.J.D., a minor, Jaime Douglas, Francisco Douglas, Jr., and Francisca Perez Delgado (Appellants), appeal the trial court's grant of summary judgment in favor of Willie J. Hardy. Appellants raise two issues on appeal. We affirm.

### BACKGROUND

Hardy owns the Sunset Valley Mobile Home Park. Tasha Douglas rented a mobile home from Hardy at the park beginning in May 2015. She paid rent to Wesley Smith, the park's maintenance man at the time. After Wesley ceased his employment at the park, Tasha paid her

rent directly to Hardy. John Smith moved into the Sunset Valley Mobile Home Park in July 2015. John took Wesley's place as the maintenance man in September 2015. John also received rent payments from tenants when they paid after hours and performed other tasks from time to time as instructed by Hardy. Hardy paid John $10.00 per hour for his work, but John never kept a regular schedule. Other than these duties, John was no different than other residents of the trailer park.

Tasha became delinquent on her rent payments, and on December 6, 2015, a constable delivered her an eviction notice. On December 8, Hardy met with Tasha, her husband Francisco ("Frank"), Humberto Douglas (Frank's brother), and John at John's trailer to discuss Tasha's rent delinquency.[1] Tasha and Frank revealed that Tasha would move into her husband Frank's trailer. Hardy agreed to give Tasha an extension and stated that she needed to vacate the trailer by December 16. The move out, cleaning of the trailer, and return of the keys were to be coordinated through John. However, Tasha was unable to fulfill this condition because she was a patient at a hospital from December 12 until December 16. Hardy gave her more time to vacate the trailer.

On December 18, Tasha finished moving her belongings to Frank's trailer. Around noon, John arrived at the trailer and asked for the keys, and Tasha replied that Frank, who was at work, had them. Tasha told John that Frank would bring the keys to him after he returned. This conversation was not acrimonious. As Tasha completed the cleaning process, Frank returned from work at around 12:30 or 12:45 p.m. Shortly after 2:00 p.m., Tasha walked to John's trailer. As she approached, she saw John drinking beer on his front porch with another man she did not recognize. John had been drinking since approximately 11:00 a.m. and had consumed between five and seven beers that day. Tasha told John that she completed the moveout and cleanup process, the trailer was ready for inspection, and Frank was at the trailer with the keys. According to Tasha, John became angry and said, "Nobody summons me to do a Goddamn thing. Get the fuck off my property." Tasha left and told Frank what happened. Tasha described Frank as "hard-headed," and knew that he had also been consuming beer. Tasha wanted to contact Hardy about what had happened. Instead, Frank became angry, grabbed the keys and a beer, and told her to "come on." As the pair walked towards John's trailer, Frank walked in front of Tasha. Shortly thereafter, Tasha saw John grab a shotgun and point it at Frank. Nevertheless, Frank continued to approach, and as soon as Frank reached John's porch, Tasha heard John say, "Get the fuck off my property or I will shoot." According to Tasha, Frank, who had his hands down by his side and a

---

[1] Frank was also a resident of the mobile home park and had his own trailer in which he resided.

2

beer in one hand, stepped on the porch, and less than two seconds later, John shot Frank in the chest, killing him. Tasha tried to approach Frank, but John screamed at her, "I'll shoot." Tasha retreated and called 911.

John was convicted in a criminal trial for Frank's murder. Appellants filed this civil suit against Maxima Interests, LP, Hardy, and John, asserting wrongful death and survival claims against them based on negligence and premises liability theories.[2] They also sought exemplary damages against Hardy and John, contending that they acted with malice and gross negligence.

Hardy filed a motion for summary judgment, which he did not clearly demarcate as either a traditional or no evidence motion.[3] In the motion, he argued that there was no evidence of the essential element of proximate causation on each of Appellants' claims, and he specifically contended that John's criminal act of murder against Frank was not foreseeable. As part of his motion, Hardy attached his affidavit and the judgment finding John guilty of murder, cited legal authorities, and made arguments attempting to negate foreseeability in general, as well as proximate causation on each of Appellants' claims. The trial court ultimately signed an "Order Granting Defendant Willie J. Hardy's Motion for Summary Judgment/No-Evidence." In the order, the trial court granted the motion in its entirety and dismissed Appellants' claims with prejudice. The trial court also granted a motion severing the claims against Hardy and Maxima Interests from the claims against John, the sole remaining defendant. The trial court subsequently signed a final judgment dismissing Appellants' suit against Hardy and Maxima Interests. This appeal followed.

## SUMMARY JUDGMENT

In their second issue, Appellants argue that the trial court erred in granting summary judgment in Hardy's favor.

### Standard of Review

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). A movant for traditional summary judgment has the burden of showing there is no genuine issue of material fact and it is entitled to judgment as a matter of law. TEX. R. CIV.

---

[2] Appellants originally filed this lawsuit in Dallas County, Texas. Hardy and Maxima Interests filed motions to transfer venue to Smith County, Texas, which were granted.

[3] Maxima Interests also filed a motion for summary judgment, which the trial court granted. Appellants did not appeal the summary judgment granted to Maxima Interests and it is not a party to this appeal.

P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). Rule 166a provides a method of summarily terminating a case when it clearly appears a question of law is involved and that there is no genuine fact issue. *See Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222 (Tex. 1999). A defendant-movant who conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010).

Separately, after an adequate time for discovery, a party may file a no evidence motion for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). A no evidence summary judgment motion under Rule 166a(i) is essentially a motion for a pretrial directed verdict, and it requires the nonmoving party to present evidence raising a genuine issue of material fact supporting each element contested in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581–82 (Tex. 2006).

When reviewing a motion for summary judgment, we review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). A motion for summary judgment will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *See City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

## Scope of Hardy's Motion for Summary Judgment

It is well settled that a trial court cannot grant a motion for summary judgment on grounds not presented in the motion. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 204 (Tex. 2002). A no evidence motion for summary judgment must identify the essential elements as to which there is no evidence. TEX. R. CIV. P. 166a(i). The motion must be specific in challenging the evidentiary support for an element of a claim or defense, and this rule does not authorize conclusory motions or general no evidence challenges to an opponent's case. *Id.* at Comment–1997. We are required to strictly enforce this requirement. *Cmty. Health Sys. Prof'l Services*

4

*Corp. v. Hansen*, 525 S.W.3d 671, 695–96 (Tex. 2017). The underlying purpose of this requirement is to provide the opposing party with adequate information for opposing the motion, and to define the issues for summary judgment. *Timpte Indus.*, 286 S.W.3d at 311.

Appellants brought negligence and premises liability claims against Hardy. Specifically, with regard to the negligence claims, Appellants alleged in their petition that Hardy "failed to use due care to avoid injury" to them, failed to "properly hire and screen [John] who, when hired, may pose a threat of injury to . . . members of the public," and that he failed to "use reasonable care in training and supervising [John]." With regard to the premises liability claims, Appellants alleged generally that Tasha and Frank were invitees on Hardy's premises and that he failed to keep them safe in order to avoid the injuries suffered by them. Although not entirely clear, it appears that Appellants' premises liability claims are based on the failure to provide adequate security measures under *Timberwalk*, as well as the limited and specific duty to prevent harm when a landowner has direct knowledge of an imminent unreasonable risk of harm under *Del Lago*. *See generally Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762 (Tex. 2010); *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749 (Tex. 1998).

Appellants argue as part of their first issue that Hardy failed to sufficiently identify the essential element he challenged in his no evidence motion for summary judgment. In his motion, Hardy specifically challenged the essential element of proximate cause for each of Appellants' claims, along with whether John's actions were foreseeable. The foreseeability element is part of determining whether Hardy owed Appellants a legal duty for their negligence claims, and the foreseeability analysis is the same for both legal duty and proximate causation. *See UDR Tex. Props., L.P. v. Petrie*, 517 S.W.3d 98, 101 (Tex. 2017) (noting that foreseeability is a "prerequisite to imposing a duty," and that "[f]oreseeability is essential to the determination of a duty in all of tort law"); *Del Lago Partners*, 307 S.W.3d at 774 (noting foreseeability analysis for existence of duty and proximate cause are the same). Moreover, the proximate cause element, including the foreseeability component, is an essential element of Appellants' negligent screening, hiring, training, and supervision claims. *See Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex. App.—Fort Worth 2008, no pet.).

The foreseeability element is also an essential element of Appellants' premises liability claims under *Timberwalk* and *Del Lago*. *See UDR Tex. Props.*, 517 S.W.3d at 101 (noting that "[t]his Court conceived the *Timberwalk* factors as a means to aid courts in determining [the

5

essential] foreseeability [element] specifically"); *see also* ***Del Lago Partners***, 307 S.W.3d at 767-69 (holding that foreseeability required to impose duty for liability of premises owner for third party criminal acts, and can be sometimes shown when property owner has actual knowledge of unreasonable and imminent risk of harm due to immediately preceding conduct by third party).

In their appellate briefs, the parties provide analysis on all elements of Appellants' claims, and Appellants had adequate information to define the issues for summary judgment and oppose the motion. *See* ***Timpte Indus.***, 286 S.W.3d at 311. Accordingly, Hardy properly raised a no-evidence motion for summary judgment on the legal duty, proximate cause, and foreseeability elements on all of Appellants' claims, and we may review the propriety of the trial court's summary judgment on each of those elements of Appellants' claims. This portion of Appellants' first issue is overruled.

## Negligent screening, hiring, training, and supervision

Negligent screening, hiring, training, and supervision claims are all simple negligence causes of action based on an employer's direct negligence rather than on vicarious liability. *See* ***Dangerfield v. Ormsby***, 264 S.W.3d 904, 912 (Tex. App.—Fort Worth 2008, no pet.). Generally, a cause of action for simple negligence arises when a person breaches a legal duty and that breach proximately causes damages. ***Id.*** In the context of these claims, Texas courts have recognized that an employer may owe a duty to the public to ascertain the qualifications and competence of the employees it hires, particularly when those employees are engaged in occupations that require skill and experience, and that could be hazardous to the safety of others. *See* ***id.*** (citing ***Morris v. JTM Materials, Inc.***, 78 S.W.3d 28, 49 (Tex. App.—Fort Worth 2002, no pet.)). However, the Texas Supreme Court has "never expressly set out what duty an employer has in hiring employees," but has recognized "there is a broad consensus among Texas courts" that these claims require "the plaintiff suffer some damages from the foreseeable misconduct of an employee hired pursuant to the defendant's negligent practices."[4] ***Wansey v. Hole***, 379 S.W.3d 246, 247 (Tex. 2012). Therefore, to impose liability on an employer under the theory of negligent hiring or retention, a plaintiff must show the employer's failure to investigate, screen, or supervise its employees proximately caused the injuries incurred by the plaintiff. ***Fifth Club, Inc. v. Ramirez***,

---

[4] The Supreme Court has not ruled definitively on the existence, elements, and scope of related torts such as negligent screening, training, supervision, and retention. *See* ***JBS Carriers, Inc. v. Washington***, 564 S.W.3d 830, 842 (Tex. 2018).

196 S.W.3d 788, 796 (Tex. 2006). To impose liability on an employer for negligent supervision, a plaintiff must show that an employer's failure to supervise its employees proximately caused his injuries. *Dangerfield*, 264 S.W.3d at 913. "To establish a claim for negligent training, a plaintiff must prove that a reasonably prudent employer would have provided training beyond that which was given and that failure to do so caused his injuries." *Id.* at 912–13.

## Legal Duty

Whether a duty exists is a threshold inquiry. *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006). A party who has no duty cannot be liable for negligence. *Id.* The existence of a duty is a question of law determined based on the facts surrounding the occurrence. *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 503 (Tex. 2017).

No general duty to control others currently exists in Texas, but a special relationship such as the employer-employee relationship may sometimes give rise to a duty to aid or protect others. *See id.* at 504. The Texas Supreme Court has recognized exceptionally limited instances where an employer has a duty to control its employee and is directly liable when it fails to do so. *Id.* at 504. These limited instances pertain to when employers require employees to consume alcohol as part of their job or exercise affirmative control over employees known to have become intoxicated from alcohol. *See D. Houston, Inc. v. Love*, 92 S.W.3d 450, 452 (Tex. 2002) (holding that the employer night club had a duty to take reasonable care to prevent employees from driving home after work because it required the employees to consume alcohol with customers as part of the job); *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 311 (Tex. 1983) (holding that an employer that exercises control over an employee because he has become intoxicated at work, even if without his employer's permission, has a duty to exercise reasonable care to ensure that the employee is not a risk to himself or others driving home).

"What duty should be imposed on employers to prevent employees from harming third persons is difficult to state generally." *Pagayon*, 536 S.W.3d at 507. When a duty has not been recognized in particular circumstances, the question is whether one should be recognized. *Id.* at 504. In determining whether to impose a duty of care, courts consider related social, economic, and political questions and their application to the facts. *Id.* Courts conduct a balancing test and weigh the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of

placing the burden on the defendant. *Id.* Courts also consider whether one party generally would have superior knowledge of the risk or a right to control the actor who caused the harm. *Id.*

"The correct balance of the factors that must be considered in creating duties is very hard to strike for all such situations because of the myriad circumstances that can arise." *Id.* at 507. The courts of appeals have often held employers to very general duties, but they have not weighed the factors that determine whether a duty exists, and what it is. *Id.* at 505-06. They have not analyzed the risk, foreseeability, and likelihood of injury in requiring employers to control employees, versus the burdens on and consequences to employers, and the social utility and realities of the workplace. *Id.* at 506. These, it must be emphasized, are matters of law to be weighed and determined by the court before a duty is applied. *Id.* It is not enough simply to require employers, or others, to exercise ordinary care in all circumstances. *Id.*

However, some of these factors may turn on facts that cannot be determined as a matter of law and instead must be resolved by the factfinder, but such cases are unusual. *Id.* at 507. One reason these issues are usually decided as a matter of law is because courts must evaluate the factual scenario in the context of similarly situated actors and determine whether the law should impose a duty on a particular class of actors. *Id.* (stating that "[t]he policy components of the factors—including the nature of the covered risks and general foreseeability—are policy issues for the court to consider as a matter of law").

## Proximate Cause

The components of proximate cause are cause in fact and foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). The elements may not be established by mere conjecture, guess, or speculation. *IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798-99 (Tex. 2003). The test for cause in fact is whether the act or omission was a substantial factor in bringing about the injury without which the harm would not have occurred. *Doe*, 907 S.W.2d at 477. Cause in fact is not shown if the defendant's act did no more than furnish a condition which made the injury possible. *Id.* The evidence must go further and show that the act was the proximate cause of the resulting injuries, not a remote cause, and the evidence must justify the conclusion that such injury was the natural and probable result thereof. *Id.*

The question of foreseeability, and proximate cause generally, involves a practical inquiry based on "common experience applied to human conduct." *Id.* at 478. It asks whether the injury

"might reasonably have been contemplated" as a result of the defendant's conduct. *Id.* Harm is foreseeable if a person of ordinary intelligence should have anticipated the danger created by an act or omission. *Bos v. Smith*, 556 S.W.3d 293, 303 (Tex. 2018). The exact sequence of events need not be foreseeable, but the conduct must be sufficiently similar to give the defendant notice of the general nature of the danger. *Id.* However, foreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury. *Doe*, 907 S.W.2d at 478. The foreseeability requirement "protects the owners and controllers of land from liability for crimes that are so random, extraordinary, or otherwise disconnected from them that they could not reasonably be expected to foresee or prevent the crimes." *Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 17 (Tex. 2008).

## Discussion

During John's criminal trial, the State asked Wesley if he had a discussion with John in September 2015, and he replied, "No," and stated that "[w]e really didn't talk." The prosecutor asked him variations of the question several more times, and he hazily remembered that John said, while Hardy was present, that "he just couldn't believe all the Mexicans that lived there." Specifically, Wesley explained: "He said something to the effect, all this—I really can't remember of all—of everything that was said because—something of all—to the effect of 'all the Mexicans that live here' or something like that. I can't remember what it was." Frank drove by in his truck, and according to Wesley, the conversation continued:

> [W]e said something about Frank and—you know, jokingly, you know. Somebody said—Mr. Hardy said something about Frank or something or another.
> And John was talking about Frank and, you know, 'All these Mexicans that live around here, I guess—you know, I guess I'm going to have to show them what I'm made of' or something like that. I can't remember what all he said. Something to that effect.
> . . . .
> At that point, after Frank had drove by, he you know, said something about the Mexicans in the park.
> And he said, 'I guess I'll just have to shoot one of them and make them realize who I am, just like I did the black guy when I was on the force.' That's when I got kind of nervous and I left.

Hardy and John worked together as police officers in Tyler during the late 1960's and early 1970's. Also, during the December 8th meeting where they discussed their options regarding Tasha's rent delinquency, John told Frank, "I'd like to whack you, just to see if you'd fall." Tasha

also explained that John and Frank had a dispute concerning Frank's pit bull dogs. Appellants argue that this evidence created a foreseeable risk of harm that proximately caused Frank's murder, and consequently, Hardy was negligent in hiring, retaining, training, and supervising John.

However, Tasha testified that, at the time of the remark during the December 8th meeting, everyone was getting along, no one pushed or punched each other, and that they were laughing. With regard to the issue between Frank and John concerning Frank's dogs, there is no evidence in the record that Hardy was ever aware of this dispute. Moreover, Tasha testified that, "other than about the dogs," there had been no problems between Frank and John. Therefore, we examine the comments made by John to Wesley and Hardy during the September 2015 conversation and apply the balancing test to determine whether Hardy owed Appellants a duty to prevent the harm suffered by them. *See Pagayon*, 536 S.W.3d at 504.

In *Pagayon*, J.R. Pagayon ("J.R.") and Carlos Cabulang ("Carlos") were both employees at a convenience store owned by Exxon. *Id.* at 500. The two men had a tumultuous relationship involving at least two prior incidents that J.R. considered to be harassment by Carlos and that were reported to the convenience store management. *Id.* at 501. Upon learning of these incidents from J.R., his father Alfredo Pagayon ("Alfredo") and Carlos got into a heated argument on the telephone after Alfredo confronted Carlos and demanded that he stop harassing his son. *Id.* When J.R. returned to work a few days after this argument, Carlos immediately began screaming and cursing at J.R., asked him to fight outside, and threatened to beat him up. *Id.*

Carlos' threatening behavior was reported to the store manager by another Exxon employee, but the manager did not intervene. *Id.* When Alfredo returned to the store later that day to pick up J.R. after his shift was over, Carlos approached Alfredo and began cursing at him. *Id*. at 502. A fist fight ensued between the two men in which J.R. subsequently joined. *Id.* After the altercation ended, Alfredo left the store in an ambulance and died several weeks later from complications attributed to his injuries. *Id.* The Pagayans sued Exxon under a negligent supervision theory. The supreme court held as a matter of law that these facts did not impose any legal duty upon Exxon to control the actions of its employee, Carlos, which caused the death of a third party, Alfredo. *Id.* at 503.

In applying the balancing test, the Court determined that the risk of an occurrence like the fight was small, because there were no repeated serious threats or actions that could pose a threat to patrons. *Id.* at 507. The court determined that the foreseeability of injury was small, and the

likelihood of injury remote. *Id.* This is because "the disagreements among Carlos, J.R., and Alfredo had been matters of words until the fistfight suddenly broke out." *Id.* Importantly, the court reasoned that "while it may have been foreseeable that those disagreements would linger or even fester, nothing suggests that they were likely to lead to serious injury." *Id.* The court stated that "[a]ny duty an employer has to control its employers should not make it an absolute insurer of their safety and the safety of patrons." *Id.* The court next found that the burden on the employer would be significant because, even though better supervision might have prevented the fight in hindsight, to impose such a duty would require the employer to investigate almost every employee complaint and monitor every situation, and would significantly burden the employment relationship. *Id.* at 507-08. The court determined that the consequences can be extreme because the "result was bizarre, given the brevity of the altercation, the absence of any weapons, and the slightness of the provocation." *Id.* at 508. Finally, the court found that "[w]hile Exxon might have been able to prevent Carlos, J.R., and Alfredo from injuring each other, the public was never in danger[, and any] social utility to requiring an employer to be as vigilant as Exxon would have to have been to prevent a fistfight involving employees is minimal." *Id.*

It is true that John's derogatory comments in some ways reflect what later occurred. However, we note that the temptation to view the result in hindsight is great, but the balancing test guards against this temptation. *Id.* at 506 ("The likelihood that a personal grudge over a phone call would lead to a fistfight and death was surely slight[, and the] temptation to view the situation in hindsight is too great."). John's actions, in many ways, are even less foreseeable than those in *Pagayon*. In *Pagayon*, the defendant had actual notice of specific conflict between its employees close in time to a subsequent assault by one of the employees against the other employee and his father, who later died, yet held there was no duty as a matter of law. *See id.* In other cases, Texas courts have similarly held that there was no duty as a matter of law when the employer knew of specific verbal threats by an employee that subsequently resulted in a violent assault to a third party. *See, e.g., Loram Maint. of Way, Inc. v. Ianni*, 210 S.W.3d 593, 594 (Tex. 2006) (holding employer had no duty as a matter of law to protect public from off duty employee's shooting of police officer, even though employer knew employee used drugs while on-duty and threatened violence to others at work); *Dailey v. Albertson's, Inc.*, 83 S.W.3d 222, 228 (Tex. App.—El Paso 2002, no pet.) (where store employee assaulted customer with box cutter, store could

11

not foresee employee's violence based only on "verbal abuse"—one loud comment directed at customer and a later brief exchange of words, with no other evidence of criminal activity).

Here, although the comments are reprehensible, they were not specifically directed at anyone and they were made only once several months prior to Frank's murder. Wesley described the comments as made in a "joking" manner. Up until the day of the murder, there were no incidents or complaints against John regarding his behavior indicating that he would act on the comments. John visited with Tasha approximately two hours prior to Frank's murder, and Tasha explained that the conversation between them was normal and not acrimonious. Less than two hours later, while Tasha attempted to return the trailer keys, John yelled at Tasha. No one notified Hardy, who was not present that day at the trailer park, of this incident. In fact, Tasha testified that she wanted to notify Hardy of the problems in returning the keys to John, but Frank instead said "come on" and walked down to John's trailer. Frank, who was described as "hard-headed," known to have a temper, and under the influence of alcohol, approached John in a state of agitation. John, who was Hardy's employee and simultaneously a resident of the trailer park, was also under the influence of alcohol, and had just yelled at Frank's wife Tasha concerning the return of the keys.[5] Tragically, John murdered Frank.

It was not reasonably foreseeable that at the time of the September 2015 comments that John would murder Frank months later when Frank and Tasha were returning the keys after having vacated the trailer. This is a bizarre, extraordinary set of events with extreme consequences. *See Pagayon*, 536 S.W.3d at 508. "To extend liability to an employer in such a situation would render the employer liable for the most extreme consequences of an unlikely set of circumstances." *See id.* Furthermore, to render Hardy an insurer of liability in these circumstances would impose too great a burden on the employment relationship. *See id.*

We hold that Hardy owed Appellants no duty to prevent John's murder of Frank because it was not reasonably foreseeable, and the balancing test requires us to conclude that whatever the contours are for imposing a duty on employers to control and prevent criminal acts of an employee do not extend to the situation here. *See id.* Therefore, with no legal duty, Hardy cannot be liable for any of Appellants' negligence claims as a matter of law. *See Elwood*, 197 S.W.3d at 794.

---

[5] There is no evidence that Hardy knew John was under the influence of alcohol that day or generally tolerated that behavior.

Similarly, there is no evidence that Hardy's actions proximately caused Appellants' damages under their negligent hiring, training, supervision, and retention claims. *See Del Lago Partners*, 307 S.W.3d at 774 (noting foreseeability analysis for existence of duty and proximate cause are the same). Moreover, Hardy hired John to be the maintenance man at the trailer park and perform similar tasks from time to time. There is no indication that this job required special skills or training, or that John was in a special position of trust or dealing with vulnerable people. *See Guidry v. Nat'l Freight, Inc.*, 944 S.W.2d 807, 810 (Tex. App.—Austin 1997, no writ). And there is no evidence that a background investigation would have revealed a foreseeable risk that John would murder Frank. *See Ogg v. Dillard's, Inc.*, 239 S.W.3d 409, 422 (Tex. App.—Dallas 2007, pet. denied) (holding no negligence when background contains no information that would cause reasonable employer not to hire or retain employee, and that single prior complaint against police officer hired as security guard, in which no disciplinary action was taken or department violation found, is not evidence that he was unfit for position as security guard).

Furthermore, there is no evidence that Hardy entrusted John with security of the premises or allowed him to carry a firearm in discharge of his job responsibilities, such that would impose a duty or otherwise render John's later actions foreseeable for the job for which he was hired as a maintenance man. *See Houser v. Smith*, 968 S.W.2d 542, 545 (Tex. App.—Austin 1998, no pet.) (citing *Estate of Arrington v. Fields*, 578 S.W.2d 173 (Tex. Civ. App.—Tyler 1979, writ ref'd n.r.e.)) (holding mechanic employee's sexual assault of customer unforeseeable, because in contrast to the job duties of the armed guard in *Arrington*, the transmission shop employee's job did not require him to be in close and possibly confrontational situations with customers or to carry a dangerous weapon, nor did it require skill or experience beyond that of a mechanic). There is also no evidence that Hardy knew John kept a firearm in his trailer. In sum, there is no evidence that Hardy's actions proximately caused Appellants' damages under their negligent hiring, training, supervision, and retention claims.

Finally, without evidence of negligence, there can be no gross negligence to support exemplary damages. *See Nowzaradan v. Ryans*, 347 S.W.3d 734, 739 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (stating that "it is well established that a finding of ordinary negligence is prerequisite to a finding of gross negligence"). Accordingly, we hold that the trial court properly granted summary judgment on Appellants' negligence claims and gross negligence allegations.

**Premises Liability**

Appellants also asserted premises liability claims against Hardy, seeking to hold Hardy liable in his role as a landowner for an alleged duty based on John's actions, not as an agent or employee of Hardy, but as a third-party resident that committed criminal acts.

In a premises liability case, the plaintiff must establish a duty owed to the plaintiff, breach of that duty, and damages proximately caused by the breach. *Del Lago Partners*, 307 S.W.3d at 767. Generally, a premises owner has no duty to protect invitees, such as tenants, from criminal acts by third parties. *See Timberwalk*, 972 S.W.2d at 756. But there is an exception when the owner knows or has reason to know of a risk of harm to invitees that is both unreasonable and foreseeable. *Id.* Foreseeability requires that the general danger, and not necessarily the exact sequence of events that produced the harm, be foreseeable. *See id*. When the "general danger" is the risk of injury from criminal activity by third parties, the evidence must reveal specific previous crimes on or near the premises to establish foreseeability. *Id.* The supreme court has recognized that "crime is increasingly random and violent and may occur anywhere" and rejected the imposition of a general duty on landlords to protect tenants whenever crime might occur. *See Del Lago Partners*, 307 S.W.3d at 768. When the premises owner has no direct knowledge that criminal conduct is imminent, the plaintiff must present evidence showing past criminal conduct made similar conduct in the future foreseeable. *See id.* Whether past incidents of criminal conduct make future incidents foreseeable depends upon factors such as proximity, recency, frequency, similarity, and publicity. *Id.* The record in this case shows that Appellants presented no evidence at trial of any recent criminal conduct near Sunset Valley Mobile Home Park similar to the incident in question. Therefore, the trial court correctly granted summary judgment in Hardy's favor on the *Timberwalk* premises liability theory. *See id.*

Appellants also appear to argue that Hardy owed a duty under the analysis set forth by the Texas Supreme Court in *Del Lago*. In *Del Lago*, the court noted the appeal concerned "a bar owner's liability for injuries caused when one person assaulted another during a closing-time melee involving twenty to forty 'very intoxicated' customers." *Id*. at 764. The court further noted "[t]he brawl erupted after ninety minutes of recurrent threats, cursing, and shoving by two rival groups of patrons." *Id.* Noting the *Timberwalk* factors were inapplicable to the case, the court asserted "[t]he nature and character of the premises can be a factor that makes criminal activity more foreseeable," and "intoxication is often associated with aggressive behavior." *Id.* at 768.

14

The court further asserted "criminal misconduct is sometimes foreseeable because of immediately preceding conduct." *Id.* at 769. For example, "when a property owner by reason of location, mode of doing business, or observation or past experience should reasonably anticipate criminal conduct on the part of third persons," then the property owner "has a duty to take precautions against it." *Id.* (internal quotations omitted). "This duty is recognized because the party with the power of control or expulsion is in the best position to protect against the harm." *Id.* The court then held under the facts in that case, Del Lago had a duty because it had "actual and direct knowledge that a violent brawl was imminent between drunk, belligerent patrons and had ample time and means to defuse the situation." *Id.*

Here, there is no evidence that Hardy had actual and direct knowledge of an imminent confrontation between John and Frank that would result in Frank's murder by John, nor was there any evidence that Hardy had the time or means to defuse the situation. Hardy was not at the mobile home park at the time of the shooting, and no one contacted him prior to or during the confrontation leading to Frank's death. Moreover, John's racially charged statements that were hazily recollected by Wesley several months prior to the shooting do not impart actual and direct knowledge of an imminent conflict to Hardy. Accordingly, we hold that the analysis in *Del Lago* is inapplicable as a matter of law. *See id.*

Finally, aside from Hardy's alleged duties as a premises owner to prevent foreseeable criminal acts against third parties, it appears that Appellants argue that Hardy owed them a general duty as invitees to inspect, warn, and prevent against dangerous conditions. To the extent that Appellants make this argument, their injuries did not arise from a "condition" on the property—which focuses on the state of being of the property itself—as opposed to negligent activity. *See, e.g., 4Front Engineered Sols., Inc. v. Rosales*, 505 S.W.3d 905, 912 (Tex. 2016). John's action in shooting and killing Frank with a shotgun is not a condition in Hardy's premises that created an unreasonable risk of harm apart from the *Timberwalk* and *Del Lago* premises claims, and does not support an independent premises liability claim as a matter of law. *See id.* Therefore, Appellants' second issue is overruled.

### EVIDENTIARY COMPLAINTS

In the remaining portion of Appellants' first issue, Appellants make several arguments challenging the sufficiency of Hardy's evidence to support summary judgment, contending that

15

Hardy's affidavit contains inadmissible hearsay, conclusory self-serving statements from an interested witness, and that he failed to show that it is based on personal knowledge. However, Hardy filed a no-evidence motion for summary judgment, which the trial court granted. *See Chrismon v. Brown*, 246 S.W.3d 102, 113-15, n.12 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding no evidence motion for summary judgment appropriate for existence of legal duty, which is a question of law that court decides from facts surrounding occurrence in question, and burden is placed on nonmovant to present evidence that raised genuine issue of fact as to whether there was legal duty). The burden was not on Hardy to establish his entitlement to summary judgment. Rather, the burden was on Appellants to produce more than a scintilla of evidence to raise a fact issue on legal duty, proximate cause, and the foreseeability of John's criminal conduct when he murdered Frank. We have held that Appellants failed to meet this burden.

Furthermore, even if we were to construe Hardy's motion as a traditional motion for summary judgment, our conclusion would be the same. Appellants appear to argue that the burden never shifted to them to create a fact issue. We recognize that the burden does not shift to a nonmovant to raise a genuine issue of material fact if the movant fails to meet its initial burden to establish its right to summary judgment. *See* TEX. R. CIV. P. 166a(c); *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000). However, in such a situation, an appellate court may still affirm a summary judgment if, after the submission of evidence by the nonmovant, the summary judgment evidence establishes the movant's right to a traditional summary judgment, even if the movant's evidence, by itself, does not establish the movant's right to a traditional summary judgment. *See Haase v. Abraham, Watkins, Nichols, Sorrels, Agosto & Friend, L.L.P.*, 499 S.W.3d 169, 177 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (citing *Wilson v. Burford*, 904 S.W.2d 628, 628–29 (Tex.1995) (per curiam)). Considering all the evidence attached to the motion and response, we have held that Hardy is entitled to summary judgment.

Finally, we need not consider Hardy's affidavit as part of our analysis. Much of its contents were duplicative of his testimony at John's criminal trial, the transcript of which was attached to Appellants' response to Hardy's motion. As we have stated, we consider all the evidence attached to the motion and response. *See id.* Even disregarding Hardy's affidavit, we have concluded as a matter of law that Appellants failed to raise a genuine issue of material fact on their claims. Therefore, the remaining portion of Appellants' first issue is overruled.

<u>**DISPOSITION**</u>

Having overruled Appellants' two issues, the judgment of the trial court is ***affirmed***.

<u>**GREG NEELEY**</u>
Justice

Opinion delivered May 15, 2019.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

17



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

MAY 15, 2019

NO. 12-18-00035-CV

**TASHA ERNEST DOUGLAS, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF FRANCISCO DOUGLAS, DECEASED, AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES, SOPHIA KATHERINE ABED AS NEXT FRIEND OF S.K.J.D., A MINOR, JAIME DOUGLAS, FRANCISCO DOUGLAS, JR., AND FRANCISCA PEREZ DELGADO,**
Appellants
V.
**WILLIE J. HARDY,**
Appellee

Appeal from the 7th District Court

of Smith County, Texas (Tr.Ct.No. 17-0933-A & 17-0933-A/S)

THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the Appellants, **TASHA ERNEST DOUGLAS, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF FRANCISCO DOUGLAS, DECEASED, AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES, SOPHIA KATHERINE**

**ABED AS NEXT FRIEND OF S.K.J.D., A MINOR, JAIME DOUGLAS, FRANCISCO DOUGLAS, JR., AND FRANCISCA PEREZ DELGADO,** for which execution may issue, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*